UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
DANIEL WILLIAM COOK and
YOLANDA T. COOK,
    Debtors.                                          No. 11-04-17704 SA

CBM GROUP, INC.,
    Plaintiff,
v.                                                   Adv. No. 07-1038 S

LINDA BLOOM, TRUSTEE,
    Defendant.

## MEMORANDUM OPINION AFTER TRIAL ON THE MERITS

This matter came before the Court for trial on the merits of the Complaint for Injunctive Relief and Declaratory Judgment filed by CBM Group, Inc. ("CBM"). CBM appeared through its attorney James A. Chavez. Defendant appeared through her attorney Linda S. Bloom PA. This is a core proceeding. 28 U.S.C. § 157(b)(2)(A). For the reasons set forth below, the Court finds that the relief sought by Plaintiff should be granted in part.

## FACTS

1. CBM is a Nevada Corporation. The Debtors are officers and sole directors of CBM, and also own at least one share of its stock.

2. Thirteen individuals and trusts, including the Debtors, own 100% of Hydroscope Group ("Hydroscope"). Debtors claim to have the controlling interest in Hydroscope.

3. Hydroscope Group owns 100% of Hydroscope Inc., USA ("HUSA"). Debtors claim to control HUSA.

4. Hydroscope USA owns all but one share of Hydroscope Canada, an Alberta, Canada corporation. One share of Hydroscope Canada ("HCAN") is owned by a Canadian barrister. Debtors claim to control HCAN.

5. All of the intellectual property ("IP") (consisting of patents, patent applications, trademarks, licenses, etc.) relevant to this lawsuit was originally developed by HCAN or acquired by HCAN at various times before July 27, 2005, with the single exception of the "Cook Business Method" ("CBM") which was invented by Mr. Cook and had a patent application pending through HUSA.

6. Some or all of the IP required periodic maintenance fees to be paid to various governmental entities around the world to maintain or acquire exclusivity.

7. Debtors, self-represented, filed a joint voluntary chapter 11 proceeding on October 21, 2004, thereby becoming debtors in possession, and remained so until August 16, 2006.

8. On or about June 17, 2005 (but purportedly "made" on January 25, 2005 and "effective" on January 28, 2005), Debtor Daniel W. Cook executed a document entitled "Agreement between Hydroscope Inc., USA [sic], Hydroscope Canada Inc. and the Cooks as Debtors in Possession and Trustees of their estate in bankruptcy created on October 21, 2004." Plaintiff's

Case 07-01038-s    Doc 33    Filed 01/31/08    Entered 01/31/08 11:22:00 Page 2 of 15

Exhibit H ("Agreement" or "Exhibit H").[1] Mr. Cook signed four times in four different capacities: Mr. Cook as Chairman of HCAN, Mr. Cook as President of HUSA, Mr. Cook as "Trustee, Debtor in Possession", and Mr. Cook as Chairman, President & CEO of Hydroscope. Page 2 of the Agreement recites in part as follows:

> HCAN acknowledges it has no resources in which to pay IP maintenance fees on patent applications filed in HCAN's name or any means to maintain any other expenses that are necessary for HCAN's survival, including registration fees and equipment storage fees.
>
> HUSA acknowledges it has no means or business income in which to pay required fees to protect its remaining owned IP or any means to maintain IP or any other expenses that are necessary for HUSA's survival, including registration fees and telephone fees.
>
> The [Bankruptcy] Estate as of January 2005 is the only entity of this group or parties that has any funds in which to maintain the collective value of CBM and Hydroscope IP.

Page 3 states in part:

> **CONSIDERATION**: HUSA, HCAN, and Daniel Cook individually, all hereby irrevocably grant any and all their respective ownership interest, if any, in owned IP and know-how that requires any financial or technical support through December 31, 2005, notwithstanding any alleged lien interest by Wells Fargo or others, to the Cooks individually as Trustees of the Cooks' Estate

---

[1] The Agreement was amended by a document executed the same day by Mr. Cook signing on behalf of the same four parties. Plaintiff's Exhibit I. The amendment does not materially change the relevant terms for purposes of this decision.

Page -3-

in Bankruptcy.  For consideration of this
irrevocable ownership grant of any and all
right, title and interest to the Cooks, the
Cooks will pay or cause to have paid
maintenance and prosecution fees on all or a
portion of any IP, but not warranting to pay,
thus attempting to preserve the IP from
expiring, as well as pay HCAN's storage fees
and HUSA's telephone bills throughout the
term of this Agreement.  Although ownership
interest is automatically granted by HCAN,
HUSA, and Daniel Cook to the Cooks as
Trustees for any payment of IP fees applied
to any patents or patent applications, the
Cooks as Trustees hereby obtain a vested
ownership interest in all IP now owned by the
parties that requires maintenance or payment
of any fees through December 31, 2005 or some
another [sic] date as may be extended by the
parties.

9. On or about July 27, 2005 (about forty days after the execution of Exhibit H), CBM and HCAN entered into a "Purchase and Sale Agreement" ("P&SA").  Plaintiff's Exhibit A.  The P&SA was executed by Mr. Cook for CBM and by Mr. Cook for HCAN, although his capacity is not listed for either entity.  It recites that HCAN no longer has the resources to maintain or utilize the IP; that the Cooks acquired certain IP "and a vested interest in additional Hydroscope® IP, all of which has been transferred into the Estate"; that HCAN continues to own certain IP; and that CBM desires to purchase and HCAN desires to sell to CBM all rights, title and interest to all HCAN Hydroscope® IP.  The P&SA then "sells, conveys, assigns, transfer and delivers to CBM" all of HCAN's IP assets as of July 25, 2005, in

Page -4-

consideration for which CBM will pay HCAN $175,000 on or before July 31, 2006. Neither the Cooks individually nor as debtors in possession were parties to the P&SA. Thus any attempt to transfer to CBM any HCAN Hydroscope® IP that had become property of the estate, if Mr. Cook intended the P&SA to effect such a transfer, would be ineffective. The P&SA contains an unusual feature; instead of an outright conveyance, the assets are transferred subject to a possibility of reverter:

> 9. <u>Maintenance</u>. CBM agrees to be responsible for all that is required to maintain Hydroscope® IP Continuing Compliance from time to time. In the event that the Cooks have commercially reasonable grounds for insecurity that CBM will not maintain Hydroscope® IP Continuing Compliance at any time during 2005 and 2006, then upon written notice from the Cooks or the Estate, all Hydroscope® IP and supporting assets shall automatically, without any further action by CBM or any other party, revert to the Cooks, the Estate, and/or HCAN as specified in such notice from the Cooks or the Estate unless CBM provides reasonable grounds for security acceptable to the Cooks that CBM will maintain Hydroscope® IP Continuing Compliance.

Black's defines "possibility of reverter" as "a reversionary interest that is subject to a condition precedent; specif., a future interest retained by a grantor after conveying a fee simple determinable, so that the grantee's estate terminates automatically and reverts to the grantor if the terminating event ever occurs." <u>Black's Law Dictionary</u> (8th ed. 2004).

Page -5-

Case 07-01038-s    Doc 33    Filed 01/31/08    Entered 01/31/08 11:22:00 Page 5 of 15

The Court notes that the concept of reversion involves an asset returning to its prior owner. Neither the Cooks individually or the Estate ever sold assets to CBM, nor did HCAN transfer its reversionary rights to the Cooks or the Estate. The Court cannot see how any of CBM's assets could ever revert to the Estate. The P&SA also contains an integration clause[2].

10. On or about July 31, 2006, CBM and HCAN entered into a "First Amendment to Purchase and Sale Agreement" ("Modification") with a purported "Effective Date" of July 31, 2006. Plaintiff's Exhibit B. The Amendment was executed by Mr. Cook for CBM and by Mr. Cook for HCAN, although his capacity is not listed for either entity. It contains nine "recitals" and three substantive amendments to the P&SA. One recital is significant: "CBM has performed all[3] Hydroscope® IP Continuing Compliance to maintain the value of assets the Hydroscope® IP owned by CBM." The amendments defer the due date of the $175,000 to December 31, 2007, accrues interest on that amount at 5.5% from July

---

[2]Black's defines Integration Clause as "A contractual provision stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract." Black's Law Dictionary (8th ed. 2004).

[3]Does this mean CBM has performed all compliance for the 2005-06 period, or does this mean that as of July 31, 2006 CBM has performed all compliance required by that date?

31, 2006, and reaffirms both parties' intention to follow through on the P&SA and Amendment.

11. On August 16, 2006, the Court appointed Ms. Bloom as Chapter 11 Trustee ("Trustee"). (Main case, doc 379).

12. On February 14, 2007, the Trustee transmitted her "Notice of Chapter 11 Trustee's Exercise of Reversion Pursuant to Purchase and Sale Agreement" ("the Notice")(Plaintiff's Exhibit U). It provides:

> You are hereby noticed that on February 14, 2007, pursuant to paragraph 9 of Purchase and Sale Agreement between CBM Group, Inc. and Hydroscope Canada, Inc. effective July 27, 2005, as amended on July 31, 2006 ("Purchase Agreement"), the Chapter 11 Trustee for the Bankruptcy Estate of Daniel William Cook and Yolanda Teresa Cook caused the Hydroscope IP and supporting assets to revert to the Bankruptcy Estate of Daniel William Cook and Yolanda Teresa Cook due to the Chapter 11 Trustee's commercially reasonable belief for insecurity that CBM will not maintain the Hydroscope IP and supporting assets.

13. On February 14, 2007, the Trustee, Scott Garrett and Pamela Jane Garrett (individually and as Trustees of a family trust and in their derivative capacity on behalf of Hydroscope) (collectively, "the Garretts") and Wells Fargo Bank, N.A. ("Wells Fargo") filed a Stipulated Motion to Approve Compromise of Controversy in the main bankruptcy case (doc 503). Briefly, the compromise resolves litigation pending in both the state court and bankruptcy court. Under the compromise the Trustee will approve a stipulated foreclosure

judgment for the IP in favor of Wells Fargo, which in turn sells the IP to the Garretts for $850,000.00 and pays $100,000.00 to the estate. Wells Fargo also foregoes any deficiency claim in the bankruptcy. Parties then mutually release each other. The compromise is subject to Bankruptcy Court approval[4].

14. This adversary proceeding followed. Plaintiff seeks injunctive and declaratory relief that CBM is the lawful owner of the HCAN IP, that the proposed compromise of controversy is an unlawful attempt to convert CBM's property (i.e., the HCAN IP), and that CBM is entitled to a judgment declaring that the Trustee is not entitled to ownership as against CBM arising from the P&SA, the Amendment, the Notice, or the proposed compromise of controversy. Defendant's answer admits the existence of the various documents and states that they speak for themselves. She denies that Plaintiff is entitled to the relief sought.

15. Mr. Cook testified at trial. The Trustee had a standing objection to Mr. Cook's testimony regarding the intent of anyone surrounding the formation or interpretation of any contracts, paragraphs or words, based on the parol evidence rule. This objection is overruled as discussed below.

---

[4] The Court currently has the motion under advisement, pending the outcome of this litigation.

Case 07-01038-s    Doc 33    Filed 01/31/08    Entered 01/31/08 11:22:00 Page 8 of 15

16. Mr. Cook testified that beginning in 2005 HCAN needed to maintain IP but had no money. Although he was already in Chapter 11 and never sought Court approval, Mr. Cook paid HCAN's maintenance fees with estate funds and in return received the patents for which he paid the fees. He described the situation as one where he had an "option" to pay more fees through December, 2005, but anything he paid for "he"[5] would then own. He testified that from January to March, 2005, he purchased six patents[6] which are listed on Exhibit A-2 to Plaintiff's Exhibit A and on Plaintiff's Exhibit E.

    The Agreement (Exhibit H) was executed on June 17, 2005, but "made" on January 25 and "effective" on January 28, 2005. Effectively, therefore, Mr. Cook was "papering" the transactions that had already taken place in January, February and March 2005.

    In June, 2005, Debtors filed a motion to obtain debtor-in-possession financing, (main case, doc 109), which was unsuccessful. Debtors were unable to pay further

---

[5] The Debtors were still self-represented at this time. Mr. Cook did not distinguish between property he might own individually from estate property.

[6] He also testified that the Garrett Group and Wells Fargo contended that the bankruptcy estate acquired no IP. Presumably this is an issue in one of the state court proceedings, where the Garrett Group and Wells Fargo are challenging the transfers of IP as fraudulent.

Page -9-

maintenance fees.  Therefore, HCAN sold the rest of its IP to CBM.  Plaintiff Exhibit A[7].  The estate acquired no additional IP after June, 2005.  The estate made no further payments for IP maintenance after June, 2005.

Mr. Cook also testified to his understanding of how Plaintiff's Exhibit H worked, i.e., if, through the end of 2005, he paid maintenance fees he would own the related patent.  Mr. Cook also testified as to Exhibit A.  He believed that the term "vested interest in additional Hydroscope® IP" meant he had the right to purchase more patents by paying the maintenance fees.

When asked why ¶ 9 was put in the P&SA (Plaintiff Exhibit A), Mr. Cook explained that CBM acknowledged the estate's right to purchase additional IP through December 31, 2005, so this provision was inserted to preserve that right and have CBM assume the obligation to sell the assets to the estate.

Mr. Cook explained the reversion of ¶ 9.  At the time the documents were executed, he did not understand whether he personally owned the Cook Business Method because it was his "idea" originally, or whether it had passed to and now belonged to the bankruptcy estate.  Hence, if the property

---

[7]Mr. Cook also testified that an attorney prepared a draft original of Plaintiff's Exhibit A, but that he made final changes.  The draft original was not put into evidence.

Page -10-

were ever to revert, it should revert to the proper previous owner.

Mr. Cook also testified about the Modification. Plaintiff's Exhibit B[8]. The P&SA was modified because CBM's plans to merge with Galtech (a third party that would provide funds to CBM) had not gone as expected. Mr. Cook testified that CBM had fulfilled all maintenance requirements, so the purpose of ¶ F was to eliminate the reversion from the P&SA. He also testified that no IP was ever lost due to CBM's failure to make a payment.

**CONCLUSIONS OF LAW**

1. The parol evidence rule does not bar this Court's hearing evidence of the circumstances surrounding the making of a contract and of any relevant usage of trade, course of dealing, and course of performance in order to decide whether the meaning of a term or expression in the contract is actually unclear. Mark V, Inc. v. Mellekas, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993)(citing C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. 504, 508-09, 817 P.2d 238, 242-43 (1991). When the evidence presented is so plain that no differing interpretations are possible, the Court interprets the agreement as a matter of law. Id. However, if the Court determines that the contract is reasonably and

---

[8]Mr. Cook testified that he alone prepared the Modification.

fairly susceptible to different constructions, an ambiguity
exists. Id. (citing Vickers v. North Am. Land Dev., Inc.,
94 N.M. 65, 68, 607 P.2d 603, 606 (1980)). If the Court
finds an ambiguity, the meaning to be assigned to the
ambiguous term is a question of fact. Id. (citing Segura v.
Molycorp., Inc., 97 N.M. 13, 18, 636 P.2d 284, 289 (1981).
To determine the meaning of an ambiguous term, the Court may
consider extrinsic evidence of the language and conduct of
the parties and the circumstances surrounding the agreement
and oral evidence of the parties' intent. Id. at 782, 845
P.2d at 1236 (citing American Bank of Commerce v. M & G
Builders, Ltd., 92 N.M. 250, 252, 586 P.2d 1079, 1081
(1978)).

2. Whether a contract contains an ambiguity is a legal
conclusion. McNeil v. Rice Engineering and Operating, Inc.,
133 N.M. 804, 808, 70 P.3d 794, 798 (Ct. App.), cert.
denied, 133 N.M. 771, 70 P.3d 761 (2003). Therefore, the
absence of ambiguity is not a fact issue on which the
parties can stipulate.

3. The Court finds that the contract at issue here, i.e., the
P&SA as modified by the Modification, is ambiguous. See
C.R. Anthony Co., 112 N.M. at 509 n.2, 817 P.2d at 243 n.2:

> Ambiguity, as it has been used in this state,
> is best understood as a proxy for describing
> lack of clarity in the parties' expressions
> of mutual assent. The term, as it has been

> employed, incorporates a variety of
> conceptual problems including the distinctive
> notions of ambiguous syntax, ambiguous terms,
> vagueness, and general lack of clarity.

and cf. McNeill, 133 N.M. at 812, 70 P.3d at 802 ("Although a written contract need not detail every term, essential terms must be expressly provided or necessarily implied by construction for a court to find the contract unambiguous on its face.")(citing C.R. Anthony Co., 112 N.M. at 507, 817 P.2d at 241.) Specifically, Recital C of the Modification could equally mean that CBM was relieved of all future duties of maintenance because it had paid all maintenance by that date, or it could mean that as of the date of the Modification CBM was current. See Ruggles v. Ruggles, 116 N.M. 52, 69, 860 P.2d 182, 199 (1993)("A contract is ambiguous if it is reasonably and fairly susceptible of different constructions.")(Citation and quotation omitted.) Because of this ambiguity, extrinsic evidence of intent may be considered to interpret the contract's terms. C.R. Anthony Co., 112 N.M. at 504, 817 P.2d at 242. This is true even though the contract that contains an integration clause. Ruggles, 116 N.M. at 69, 860 P.2d at 199.

Mr. Cook's testimony cures the ambiguity; his testimony was that CBM had performed all that was required under the entire contract for maintenance, and that therefore the

Page -13-

reversion in the P&SA was no longer in play. CBM had, in fact, maintained exclusivity and no IP was lost.[9]

4. Ms. Bloom's exercise of the reversion was void and of no effect.

5. Because the Court finds that the reversion was no longer in play, the Court need not make further findings or conclusions regarding whether other terms in the P&SA are ambiguous.

6. The Court need not make any findings or conclusions on commercial insecurity or CBM's attempted cure because the exercise of the reversion was void.

7. The Court need not make any findings on whether the right of reversion was personal to the Cooks or passed to the Estate.

8. Because the right of reversion expired when CBM fully completed its duties under the P&SA, no IP entered the estate pursuant to any reversion, and therefore the issues of fraudulent transfers of Estate property and breach of fiduciary duties by the Cooks are moot.

9. HCAN is not before the Court, so the Court cannot make any rulings on whether the P&SA is still in effect nor can it make any determination as between CBM and HCAN which party owns any particular asset.

---

[9]Defendant's expert testimony was not to the contrary. The IP that was lost was the Estate's.

Page -14-

Case 07-01038-s    Doc 33    Filed 01/31/08    Entered 01/31/08 11:22:00 Page 14 of 15

_____
Honorable James S. Starzynski
United States Bankruptcy Judge

date entered on docket: January 31, 2008

copies to:

James A Chavez
320 Gold SW Ste 1400
Albuquerque, NM 87102-3248

Linda S. Bloom
Trustee
PO Box 218
Albuquerque, NM 87103-0218

Page -15-